## Commonwealth *against* Jolliffe.(*a*)

It is a principal cause of challenge that the juror has been summoned as a witness by the prisoner.

The commonwealth, though precluded from challenging peremptorily by the act of 1834, is not bound to assign a cause of challenge before the panel has been exhausted.

THE prisoner was indicted for arson. The Attorney-General challenged for cause, and showed that the juror was summoned as a witness for the prisoner; which *Austin* insisted was not a principal cause of challenge, and cited Harper *v.* Kean, 11 *Serg. & Rawle* 280.

The Court, by GIBSON, C. J. (without hearing *M'Giffin* and *Howel* contra).—A very slight probability of bias is sufficient to exclude. A juror has been set aside because he was godfather to the plaintiff's child; *Moore* 3, *pl.* 10; and several causes of challenge, as nice, have been sustained, as for very remote consanguinity or a malicious action against the challenger. Nor has a prisoner cause to complain, in this respect, of the extreme jealousy of the law. Having no title to a fortuitous advantage from prejudice, the law awards him a fair trial, and it awards no more. He has a right to a trial by jurors superior to exception; and it would be strange were his peremptory challenges not to give it to him: but he has no right to a trial by jurors who are not superior to exception by the commonwealth; and that a witness is supposed to stand as a partisan is shown by more than one passage in the law. The concluding words of a declaration, " and therefore he brings suit," or, according to the Norman orthography, "*suite*," were affixed at a time when a suitor's witnesses were his followers, and equally as prompt to maintain his quarrel in the forum as in the field; and though a milder tone of contestation has supervened, experience proves that a party usually selects his witnesses from his friends, or that they insensibly catch the spirit of the side on which they are marshalled. And it is on the presumed existence of that spirit that the law gives a right to cross examine by leading questions before an actual bias has been disclosed. But the argument rests on something more solid than analogy, for it was anciently held to be a principal cause of challenge that the juror was a witness named in a deed in contest. *Co. Litt.* 157, *a.* It is true that such witnesses were added to the inquest, and might, in some sort, be said to join in the verdict; but, though the distinction may

(*a*) Fayette Oyer and Terminer, October 25th, 1838. *Coram* GIBSON, Chief Justice; ROGERS and SERGEANT, Justices.

VII.—2 z

[Commonwealth v. Jolliffe.]

seem to be a flimsy one, they were not jurors.  *Co. Litt.* 6, *b.*  The cause of *his testibus* has long been discontinued as an integrant part of a deed, but the reason of the challenge remains.  In Harper *v.* Kean, the juror was not brought into court as a witness, and his former testimony raised no presumption of bias: it may have been for that reason that he was not summoned.  It certainly would not have entitled the other party to call and cross examine him in the first instance.  A juror may certainly be a witness; but the converse cannot be affirmed.  He is sometimes called to character, or a fact newly sprung up; but did the party who uses him omit to summon him in order to have him of the panel, that might be a cause of challenge to the favour, for the reason that a covinous action against a party is to be disregarded.  *Tr. per Pais* 165.  The presumption in the case of a witness, therefore, is against impartiality.

Challenge allowed.

The Attorney-General subsequently challenged another juror; and *Austin*, insisting for the prisoner that peremptory challenges by the Commonwealth are taken away by the act of 1834, moved that the Attorney-General be presently put to show his cause of challenge. *M'Giffin* and *Howel* argued that the interpretation to be put on that act is the same that was put upon the 33 Ed. 1, stat. 4, and cited *Roberts's Dig.* 328.

The Court, by GIBSON, C. J.—At no time since the 33 Ed. 1 could the crown or the commonwealth challenge peremptorily.  By that statute it was ordained that "if they who sue for the king will challenge any of those jurors, they shall assign of their challenge a cause certain; and the truth of the same challenge shall be inquired of according to the custom of the court."  And this enactment, which stood in force here till it was supplied by the act of 1813, had been so construed as not to require the attorney-general to show cause of challenge before the panel was exhausted.  The act of 1813 simply ordained "that in any case of felony the commonwealth shall not challenge without cause;" a provision repealed in the act of 1834, now in force.  The legislature doubtless supposed that the state had a right of peremptory challenge by the English statute: indeed the practice under it might seem to imply it, as its indulgence was sparingly claimed, and seldom, if ever, in a case where the panel afterwards happened to be exhausted; so that there was no occasion to look narrowly into the foundation of it; and hence it came to be supposed that the public privilege, whether absolute or qualified, had been taken away.  Both the bench and the bar incautiously acted on that supposition in the Commonwealth *v.* Lesher, 17 *Serg. & Rawle* 155. It is true the question there was not whether the commonwealth should presently assign a cause of challenge, but whether the cause voluntarily assigned were sufficient; yet had it been supposed that the juror could be set aside without it, the difficulty would have been

[Commonwealth v. Jolliffe.]

disposed of without engrafting a new cause of challenge on the original stock.    The shift we were put to in that case to prevent the trial from being made a mockery of justice, by the supposed disturbance of the existing system, would justify any construction however strained to keep it on the old foundation.    The particular mischief was indeed obviated ; but what could obviate the infinite variety of mischiefs that would perpetually rush in hereafter ?    The juror may be notoriously bound to the prisoner by the most absolute ties of feeling ; he may even be notoriously confederate with him in guilt ; and yet there may be no specific proof of it to ground a challenge for favour.    Except to add the prisoner himself to the panel, I know of no more effectual way to screen guilt from punishment than to give the prisoner his choice of the panel.    Total impunity was not the end proposed by the legislature ; nor ought it perhaps to be desired by the philanthropist.    It is not easy to discover a conclusive reason why the punishment of a felon ought to move our tenderest sympathies ; or why the laws ought to be defectively constructed on purpose that he might elude them.    To rob the executioner of his victim where the laws are sanguinary, might be an achievement to boast of ; but we were told at the mitigation of our penal code that the certainty of conviction to be expected from mildness of punishment would more than compensate in its effects the want of that severity which was thought to deter by its terrors. It may be doubted, therefore, whether the prevalent spirit of acquittal which impels judges and jurors to lay hold on the most improbable circumstances, or, where these are wanting, to assume the prisoner's innocence by an effort of faith—which acts upon an imaginary distinction betwixt natural and technical disbelief of evidence competent in point of law, and not only credible in point of fact, but entirely satisfactory to the natural understanding—which, like charity, beareth all things, believeth all things, hopeth all things, endureth all things : it may be doubted, I say, whether this spirit hath not already been carried too far.    If it is to be further indulged, a shorter and certainly a cheaper way of attaining its end would be to have no prosecutions at all ; but it is one which would scarce be found to answer in the state of the times.    Why then should a prisoner have more than serves to give him a fair trial ?    His twenty peremptory challenges certainly give him that ; and having secured to him all he had a right to require, it must have occurred to the legislature that the commonwealth ought to have a fair trial too. Did we believe that an unfair advantage was intended, we might be bound to favour that construction which would give him the benefit of adventitious prepossessions ; but as we could believe it only on compulsion, we are at liberty to carry out what we may suppose to have been the legislative design.    The act of 1834, like that of 1813, is a repetition of the English statute ; and there is no reason why it should not have the like interpretation.    Nothing is open to it but the time ; and there is not a word, circumstance or reason in

[Commonwealth v. Jolliffe.]

either to raise a difference as to that.    It was well remarked  by the late President *Roberts* in his *Digest*, *p.* 329, that the attorney-general, who is usually unassisted by a  private prosecutor  in  capital  cases, and whose business it is not to hunt up witnesses, might  be  unprepared with instant proofs, and yet be  perfectly prepared at the close of the panel.    It is to be remembered  too, that what is claimed for the commonwealth is not a prerogative but an indulgence, which can deprive the prisoner of no advantage which it is the policy of the law to allow him.    And it is an indulgence which cannot be turned to purposes of oppression, as an excessive use of it would  defeat itself, by hastening the close of its duration.    As there is nothing in the words of the act to deprive the commonwealth of it, and  as it is one which is indispensable to criminal justice, we are of opinion that the motion be disallowed.

Juror set aside.

A full  jury was obtained without exhausting  the  panel, and  the prisoner was acquitted in the face of full and overpowering proof.